**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| KIDANE KIFLE, *et al.* | : | | |
| | : | | |
| *Plaintiffs*, | : | Civil Action No.: | 22-02056 (RC) |
| | : | | |
| v. | : | Re Document No.: | 14 |
| | : | | |
| ZP TOWING, | : | | |
| | : | | |
| *Defendant*. | : | | |

**<u>MEMORANDUM OPINION</u>**

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A DEFAULT JUDGMENT**

**I.  INTRODUCTION**

This action arises out of a dispute where Kidane Kifle and KNT Signs & Graphics LLC (collectively, "Plaintiffs") brought suit alleging that ZP Towing ("Defendant") towed Plaintiffs car and never returned it despite repeated inquiries, thereby breaching a contract with Plaintiffs, unlawfully converting Plaintiffs' property, and trespassing against Plaintiffs' chattel.  When Defendant failed to respond to the complaint, Plaintiffs moved for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2).  For the reasons stated below, the Court will grant the motion for default judgment in part and deny it in part.  Because the record contains insufficient information to calculate damages, Plaintiffs are ordered to provide more information to support their damages claim.

## II.  FACTUAL BACKGROUND

Plaintiffs KNT Signs & Graphics LLC and Kifle are the "Buyer (and Co-Buyer)," respectively, of a 2015 Toyota RAV4 purchased on October 20, 2018.[1]  Ex. 1, Pls.' Renewed Motion for Default Judgment ("Pls.' Mot."), ECF No. 14-1.  The nature of the relationship between Plaintiffs is otherwise not explained in the complaint or renewed motion for default judgment.  *See generally* Complaint ("Compl."), ECF No. 1; Pls.' Mot, ECF No. 14.

At approximately 5:17 pm on July 16, 2020, Plaintiffs' RAV4 was hit in the rear by another car while parked in N.W. Washington, D.C.  *See* Compl. ¶ 6.  The police called Defendant to tow Plaintiffs' car, and upon arrival of Defendant's tow truck, Plaintiff Kifle spoke with the truck's driver.  *Id.* ¶¶ 6, 7.  Within the scope of his employment at Defendant ZP Towing, the truck driver entered into an oral contract with Kifle to tow his car to Virginia.  *Id.* ¶ 7.  Defendant's employee stated that Kifle would not need to pay a towing fee because the insurance company for the driver who hit the RAV4 would pay.  *Id.*  Kifle provided Defendant's employee with his driver's license so that Defendant would have Kifle's contact information and could verify Kifle's identity when he picked up the RAV4.  *Id.*

Several days later, Kifle went to the police station to obtain the police report so that he could contact Defendant about returning the RAV4.  *Id.* ¶ 8.  Due to administrative problems at the police station, it took Kifle nearly two weeks to get a copy of the police report with Defendant's information.  *Id.*  When Kifle received the report, he contacted Defendant, and spoke to an unhelpful agent and/or employee of Defendant who was reportedly "rude and refused

---

[1] The complaint identifies the car as a 2014 RAV4, but the exhibits show that it was a 2015 RAV4.  Ex. 1, Pls.' Mot.

to give Kifle any information[ ] about his car." *Id.*  Kifle was informed only that the offending driver's insurance company already paid the towing fees to Defendant. *Id.*

In the absence of the RAV4, Kifle rented a car from July 18, 2020 to August 15, 2020 from Avis Worldwide. *See* Ex. 2, Pls.' Mot. ECF No. 14–1.  While approximately the first two weeks of the rental coincided with the period Kifle waited for the police report, the remaining period of the rental was after Kifle spoke with Defendant's employee. *See* Compl. ¶ 8; *see also* Ex. 2, Pls.' Mot.  After the rental period ended, Kifle still did not have his RAV4 back and "needed another car but it was difficult to obtain another one because[] he couldn't provide an adequate explanation why he didn't have his current one." Compl. ¶ 9.  During this time, Kifle experienced emotional distress. *Id.*  With the help of a friend, Kifle was able to purchase another car. *Id.*

On December 15, 2020, the Virginia Department of Motor Vehicles ("DMV") sent a letter to Kifle about the RAV4, informing him that the DMV had been contacted by Defendant to "furnish ownership and lienholder information on the [RAV4], for which [Kifle] is the owner of record." Ex. 2, Compl., ECF No. 1-1.  Defendant had requested the information to establish a lien against the RAV4 pursuant to a Virginia law allowing a business who has performed work on or stored a vehicle "to apply for a Mechanic's and Storage Lien if the repair/storage bill has not been paid," which can "result in the sale of the vehicle." *Id.*

Plaintiffs' counsel sent a letter to the DMV in reply explaining that Defendant had not presented Plaintiffs with any bill related to the RAV4, and urging the DMV to "have the appropriate individual(s) send any bill(s) . . . to [the counsel's] office." Ex. 3, Compl., ECF No. 1-1.  After sending this letter, Plaintiffs and their counsel still did not receive a bill or any additional information from Defendant.  *See* Comp. ¶ 10.  In January 2021, Plaintiffs' counsel

sent a letter to Defendant stating that Kifle had attempted to receive information about storage fees for the RAV4 but had been unsuccessful, and asking Defendant to send a bill as soon as possible. *Id.*; Ex. 4, Compl., ECF No. 1-1. Defendant did not respond. Ex. 5, Compl., ECF No. 5. In March 2021, Plaintiffs' counsel sent another letter to Defendant noting that he had "left several messages but only received one return call" from Defendant, where he "was informed that the supervisor would contact [him] about the money needed to release [Kifle's RAV4]." *Id.* Again, Defendant did not respond. Compl. ¶ 11.

On May 5, 2021, Plaintiffs' counsel called Defendant and spoke to a person named "Michael" who allegedly "went into a tirade about scams and [said] that he wrote . . . and took pictures" supposedly of Kifle. Ex. 7, Compl., ECF No. 1–1. When asked who he was talking about, "Michael" would not provide the attorney with Kifle's name, nor say when or where he sent a letter to Kifle. *Id.* Eventually, in response to these questions from Plaintiffs' counsel, "Michael" said "to sue him and he hung up the phone." *Id.* After the interaction, Plaintiffs' attorney sent letters to Virginia Governor Ralph Northam and the DMV asking for assistance with the return of the RAV4 and requesting information on the procedure for filing a complaint against Defendant's towing company license. *See id.;* Ex. 6, Compl., ECF No. 1-1; Compl. ¶ 11.

After these numerous failed attempts to resolve the issue with Defendant, and with the RAV4 still missing, in July 2022, Plaintiffs filed this case alleging breach of contract, conversion, and trespass to chattel. *See* Compl. at 3–5. After a series of attempts to locate Defendant's registered agent, Ali Husnain, he was eventually served on May 4, 2023. *See* Mot. for a Clerk's Default ¶ 1, ECF No. 11. With no responsive pleadings from Defendant within the time allotted, the Clerk of Court entered default against Defendant on June 21, 2023. Clerk's Entry of Default at 1, ECF No. 12. Plaintiffs then filed a Motion for Default Judgment on June

4

22. Pls.' Mot. for Default Judgment, ECF No. 13.  After considering the motion, the Court ordered Plaintiffs to submit another motion for default judgment, "with supporting declarations and documentary evidence."  Min. Order, June 23, 2023.

On August 16, 2023, Plaintiffs filed a renewed motion for default judgment, which is now before the Court.  Pls.' Mot. ¶ 2.  Plaintiffs request "monetary damages as a result of the Defendant's action" that amount to $94,135.99.  *Id.* ¶ 3.  Specifically, Plaintiffs allege $32,631.80 in damages for the loss of the RAV4.  *Id.*  Plaintiffs also allege $60,598.48 in damages from the purchase of a replacement car and $1373.71 in damages from the cost of a rental car.  *Id.*  In addition, Plaintiffs request loss of use damages of $15,000 and punitive damages of $94,135.99.  *Id.* ¶ 4–5.  In total, Plaintiffs request a default judgment of $203,271.98.  *Id.* ¶ 6.

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(a), the Clerk of Court "must enter a party's default '[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise.'"  *SNH Med. Off. Props. Tr. v. Healthy Eateries LLC*, 325 F.R.D. 514, 518 (D.D.C. 2018) (quoting Fed. R. Civ. P. 55(a)).  Only then can the Court enter a default judgment, which is in the sole discretion of the trial court.  *See id.* (citing Fed. R. Civ. P. 55(a)); *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980)).  Upon entry of default by the Clerk of Court, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint."  *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002).

"A default judgment establishes the defaulting party's liability for every well-pled allegation in the complaint . . . [but] does not automatically establish liability in the amount claimed by the plaintiff." *Limbach Co., LLC v. Ten Hoeve Bros, LLC*, 126 F. Supp. 3d, 105, 108 (D.D.C. 2015) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Newburgh Glass and Glazing, LLC*, 468 F. Supp. 2d 215, 217 (D.D.C. 2007)). The trial court exercises its discretion in determining the appropriate amount for liability in a default judgment. *Id.* Unless a plaintiff's requested damages are certain, the Court "is required to make an independent determination of the amount of damages to be awarded." *Id.* (quoting *Serv. Emps. Int'l Union Nat. Indus. Pension Fund v. Artharee*, 942 F. Supp. 2d 27, 30 (D.D.C. 2013)). An evidentiary hearing is not necessary in determining the amount of damages, "as long as the court ensures that there is 'a basis for the damages specified in the default judgment.'" *Id.* (quoting *Boland v. Elite Terrazzo Flooring, Inc.,* 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). When seeking default judgment, "a plaintiff 'must prove his entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely.'" *Reisinger v. Dist. Builders of S. Md.*, No. 19-cv-1358, 2020 WL 1189305, at *2 (D.D.C. Mar. 12, 2020) (quoting *Bricklayers & Trowel Trades Int'l Pension Fund v. Miami Valley Masonry, Inc.*, 288 F. Supp. 3d 257, 259 (D.D.C. 2018)).

## IV.  ANALYSIS

"Given 'the absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense,' the Court concludes that default judgment is appropriate in this case." *SNH Med. Off. Properties Tr.*, 325 F.R.D. at 518 (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008)). Accordingly, the Court will now review Plaintiffs' basis for their claimed damages.

### A. Conversion Damages

Plaintiffs have claimed both conversion and trespass to chattels. The tort of conversion in the District of Columbia is "an unlawful exercise of ownership, dominion, and control over the personalty of another and the denial or repudiation of his right to such property." *Washington Gas Light Co. v. Pub. Serv. Comm'n of D.C.*, 61 A.3d 662, 675 (D.C. 2013) (quoting *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011)); *Reisinger*, 2020 WL 1189305, at *3 (same). Yet, "not every wrongful interference" with another's property is conversion. *See Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969). "Where the intermeddling falls short of the complete . . . deprivation of possessory rights in the property, the tort committed is not conversion, but the lesser wrong of trespass to chattels." *Id.* Because Plaintiffs' vehicle was taken by Defendant nearly four years ago and never returned, the Court will calculate damages for the more extreme tort of conversion, which necessarily would include trespass to chattels within its scope. *See* Compl. at 2.

#### 1. Value of the RAV4

In calculating damages for conversion, "[t]he traditional standard . . . is the fair market value of the property *at the time of the conversion*." *Maalouf v. Butt*, 817 A.2d 189, 190 (D.C. 2003) (emphasis added) (quoting *Bowler v. Joyner*, 562 A.2d 1210, 1213 (D.C. 1989)). "[A]n owner's estimate of her property's value, although she lacks experience or hard evidence to support the claim, is admissible as to value though subject to discount for lack of credibility." *Id.* at 191. Here, Plaintiffs did not provide an estimate on the value of the RAV4 at the time the conversion took place in July 2020. Instead, Plaintiffs only supplied the Court with the price they paid for the vehicle in October 2018. *See* Ex. 1, Pls.' Mot.

Specifically, Plaintiffs say that damages for "Loss of the car the Defendant Converted" are $32,163.80. *See* Pls.' Mot. ¶ 3; Ex. 1, Pls.' Mot. According to the 2018 "Retail Installment Sales Contract" for the initial purchase of the RAV4, the purchase price of the RAV4 was $20,822.68, with Plaintiffs making a $2,000 down payment and financing the remaining $18,822.68. Ex. 1, Pls.' Mot. Plaintiffs were scheduled to pay an additional $11,341.12 in interest associated with the financing, making their total cost to purchase the RAV4 $32,163.80. *Id.* Once in Plaintiffs' possession, however, the value of the RAV4 would not include these financing costs. Moreover, even the $20,822.68 number would be too high, as nearly 2 years had elapsed since the RAV4 was purchased and it had just been damaged in a car accident when Defendant converted it. *Id.* (stating the RAV4's purchase "contract date" as "10/20/2018"); Ex. 1, Compl. (showing photograph of the damage to the left rear of the RAV4).

Thus, for the purposes of estimating the fair market value of the RAV4 "at the time of the conversion," the Court has insufficient evidence on which to base the value of the vehicle. *See Maalouf*, 817 A.2d at 190; *see also Sawyer v. Monarch Cab Co.*, 164 A.2d 340, 341–42 (D.C. 1960) (reversing and remanding to lower court when damage to taxicab was calculated solely on basis of its purchase price, not considering such pertinent factors such as mileage, length of time in operation, and manner of use). There is no doubt that Defendants have suffered damage, and "'[a]n injured party will not be precluded from recovering damages because he cannot prove his exact damages' so long as there is a reasonable basis for approximation." *Bowler v. Joyner*, 562 A.2d 1210, 1214 (D.C. 1989) (quoting *R.S. Willard Co. v. Columbia Van Lines Moving & Storage Co.*, 253 A.2d 454, 456 (D.C. 1969)). But Defendants have not proven such a reasonable basis here. "Because the Court cannot determine the amount of damages owed based on plaintiff[s'] [evidence], plaintiff[s'] are hereby ordered to provide more information" to

support the fair market value of the RAV4 in July 2020 after the accident.  *See SNH Med. Off. Props. Tr.*, 325 F.R.D. at 519.

### 2.  Loss of Use

Plaintiffs also ask for $1373.71 in damages based on rental car expenses, along with a separate request of $15,000 more in "loss of use" damages.  Pls.' Mot. ¶¶ 3–4.  In actions for conversion, plaintiffs can seek compensation for damages stemming from the loss of use of the converted property.  *See Gamble v. Smith*, 386 A.2d 692, 694–95 (D.C. 1978).  However, "an owner seeking either to repair or to replace his vehicle must mitigate his damages through prompt action.  His recovery for loss of use must be limited to a period of time reasonably necessary to repair or replace the car."  *Id.* at 695 n.8.  To be granted loss of use damages, a plaintiff should show that equipment was rented to replace the converted property or that in the absence of the property, the plaintiff suffered a particular loss.  *See* 2 Stuart M. Speiser, et al., *The American Law of Torts* § 8:36 n.1 (Feb. 2024 Update).

It is not clear how Plaintiffs arrive at their amount of loss of use damages.  *See* Pls.' Mot. ¶ 4.  Here, the only evidence-backed basis for loss of use damages is the cost of an AVIS rental car starting from the time when Kifle spoke with Defendant's employee and lasting until the rental car was returned.  *See* Compl. ¶ 8; Ex. 2, Pls.' Mot.  Plaintiffs do not allege any attempt to get the RAV4 back from Defendant before getting the police report, Compl. ¶ 8, so it would be improper to include the period before Kifle contacted Defendant as part of the calculations for loss of use stemming from Defendant's actions.  Kifle rented the Avis car for 28 days, starting on July 18, 2020, and the first day of the rental was approximately the same day Kifle went to the police station.  *See* Compl. ¶ 8; Ex. 2, Pls.' Mot.  Kifle received the police report about two weeks after requesting it—and hence two weeks after the start of the rental—and then talked to

Defendant's employee, who refused to provide information about the RAV4.  *See* Compl. ¶ 8.  This point, therefore, starts the clock for Defendant's loss of use liability.  After Kifle's interaction with Defendant's employee, he had the rental car for another 14 days, until August 15, 2020.  Ex. 2, Pls.' Mot.  The total cost of the rental car divided by the number of days the car was rented comes out to approximately $49.06 per day.  *Id.*  Multiplying the price per day by 14 days leaves Defendant liable for $686.86 in loss of use damages.[2]

Otherwise, Plaintiffs have not introduced any other evidence of loss of use damages.  Plaintiffs did not purchase a replacement car until December 31, 2022, over two years after Defendant towed Plaintiffs' original RAV4.  *See* Ex. 3, Pls.' Mot.[3]  It is unknown whether Kifle had access to another car during this time period, and he does not provide any other details on what his transportation practices and expenses may have been during these two years.  *See* Compl. ¶ 9 (alleging that "Kifle needed another car but it was difficult to obtain another one").  Without this information, the Court cannot ascertain loss of use damages for the time period beyond August 15, 2020.

Plaintiffs' motion also does not elaborate on why Kifle took more than eighteen months after May 5, 2021 – the last identified date where Plaintiffs' describe their attempts to get the RAV4 back – to buy a replacement vehicle.  *See* Ex. 6, Compl.; Ex. 7, Compl.  At most, the Court can glean from the complaint that "it was difficult [for Kifle] to obtain another car because [] he couldn't provide an adequate explanation why he didn't have his current one."  Compl. ¶ 9.

---

[2] 14 days is evidently well within the "period of time reasonably necessary" to replace the RAV4.  *Gamble*, 386 A.2d at 694–95.

[3] The "Retail Installment Sale Contract" for the replacement vehicle does not directly specify a signing date, but that small print at the bottom of the page states that "THIS CUSTOMER COMPLETED COPY WAS CREATED ON 12/31/2022."  Ex. 3, Pls.' Mot. (capitalization in original).  In addition, the "Total Loss Protection Addendum" for this car was signed on "12/31/22."  *See* Ex. 4, Pls.' Mot.

If Plaintiffs seek additional loss of use damages, and especially loss of use damages that stretch beyond May 2021, they should explain the meaning of this allegation and provide any other reasons that would explain the delay in buying a replacement car, such as financial incapacity to make a down payment or to obtain financing. *See Gamble,* 386 A.d at 695 n.8 ("recovery for loss of use must be limited to a period of time reasonably necessary to repair or replace the car.").

In sum, Plaintiffs have presented sufficient proof of a small amount of loss of use damages. These damages amount to **$686.86** for the latter fourteen days of the Avis car rental.

### 3.  Damages for Cost to Buy Replacement Car

Plaintiffs also seek full reimbursement for the cost of the replacement car, a 2020 RAV4 purchased on December 31, 2022, for a total cost of $60,598, including future scheduled loan payments.[4] Pls.' Mot. ¶ 3; Ex. 3, Pls.' Mot. The Court emphasizes that in cases for conversion "[t]he usual and 'traditional' measure of damages for conversion of property is 'the fair market value of the property at the time of the conversion.'" *Trustees of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009) (quoting *Maalouf,* 817 A.2d at 190). Plaintiffs do not introduce an argument or basis for why they should receive damages not only for the value of the 2015 RAV4, but also for the cost to purchase a 2020 RAV4 as a replacement.

There are other issues with this attempt to seek damages. Unlike the original RAV4, which KNT Signs & Graphics purchased with Kifle as "Co-Buyer," the replacement was purchased only by Kifle with no "Co-Buyer." Ex. 1, Pls.' Mot.; Ex. 3, Pl.'s Mot. The Court is

---

[4] Kifle made a $4,000 down payment, with an additional $33,917.06 financed, making the sale price of the replacement car a total of $37,917.06. Ex. 3, Pls.' Mot. In addition, Kifle is scheduled to pay $22,681.42 in interest for the financing, meaning that the purchase of the replacement car will eventually cost Kifle $60,598.48. *Id.*

11

unsure what to make of the financial relationship between Plaintiffs, which they have not spelled out in their complaint, motion, or exhibits, and how that relationship might affect their respective damages. The Court is also not sure how to interpret Plaintiffs' allegation that Kifle "had to request a friend to help purchase a car" and that "the friend helped and Kifle was able to purchase another car," which possibly indicate that Kifle received financial assistance from this friend. Compl. ¶ 9. In any event, the Court does not see how Plaintiffs could receive conversion damages stemming from Kifle's purchase of a more expensive car.[5]

### B. Breach of Contract Damages

Plaintiffs also seek damages for breach of contract. Contract damages are intended to give the injured party "the benefit of his bargain." *Limbach*, 126 F. Supp. 3d at 109 (quoting *Vector Realty Grp., Inc. v. 711 Fourteenth Street, Inc.,* 659 A.2d 230, 234 n. 8 (D.C. 1994)). Where a party fails to perform its obligations under a contract, "the non-breaching party is entitled to receive the amount it costs to complete the service, to the extent that amount exceeds the original contract price." *Id.* (emphasis redacted) (quoting *Rowan Heating-Air Conditioning-Sheet Metal, Inc. v. Williams*, 580 A.2d 583, 585 (D.C. 1990)). Here, in light of the entry of default, the Court does not doubt that Defendant breached an oral contract with Plaintiffs to tow the RAV4 and then return it at a later period. Yet, the Court hesitates when asked to calculate the "costs to complete the service" to determine damages from Defendant's breach of contract. *See id.* Plaintiffs did not pay Defendant anything to tow the RAV4. Compl. ¶ 4. The "service" here, *Limbach*, 126 F. Supp. 3d at 109, would have to be the return of the RAV4 to Plaintiffs'

---

[5] Although the 2020 RAV4 replacement car was ultimately nearly twice as expensive – including the cost of loan repayments – as the 2015 RAV4, both cars are the same model and were both purchased approximately 3 to 4 years after being manufactured. Ex. 1, Pls.' Mot.; Ex. 3, Pl.'s Mot.

12

possession. By all accounts, the actual return of that vehicle is no longer possible. Thus, Plaintiffs have been damaged in the amount that it would cost to purchase a closely comparable vehicle – that is, another 2015 RAV4 with similar car accident damage. In other words, this would be the same "fair market value" inquiry that the Court considered when reviewing Plaintiffs' claim for conversion damages. As a result, the Court need not engage in any additional analysis on contract damages.

### C. Punitive Damages

"It is well-recognized that punitive damages are not favored in the law . . . [t]he most appropriate field for their application is the realm of tort actions generally . . . but even there, they are available only in cases which present circumstances of extreme aggravation."[6] *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982). "The basic purpose of punitive damages is to deter and punish." *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 945 F. Supp. 2d 81, 87 (D.D.C. 2013) (quoting *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C. 2004)). To recover punitive damages on an intentional tort, a plaintiff must establish that the tortious act was committed with "an evil motive, actual malice, deliberate violence or oppression" or in support of "outrageous conduct in willful disregard of another's rights." *Calvetti*, 346 F. Supp. 2d at 108 (quoting *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C. 1988) (internal citations omitted)).

Plaintiffs request punitive damages amounting to $94,135.99, equivalent to the amount they seek in damages for the combined cost of the 2015 RAV4, the rental car expenses, and the

---

[6] The focus of the discussion on punitive damages will be Plaintiffs' conversion claim because in the District of Columbia, "punitive damages are generally not recoverable . . . for breach of contract." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C. 2004) (quoting *Den v. Den*, 222 A.2d 647, 648 (D.C. 1966)); *see also Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1173 (D.C. 2004).

price to purchase the replacement 2020 RAV4. *See* Pls.' Mot. at 1–2. But here, Plaintiffs' request for punitive damages is unsuccessful. Punitive damages are reserved for situations where the defendant's tortious act is "accompanied with fraud, ill will[,] recklessness, wantonness, oppressiveness, wilful [sic] disregard of the plaintiff's right, or other circumstances tending to aggravate the injury." *819D v. Potomac Constr. Grp.*, No. 1:19-cv-00080, 2020 WL 5518215, at *3 (D.D.C. 2020) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 657 (D.C. Cir. 2001)). For an award of punitive damages, Plaintiffs need to show "evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent." *819D*, 2020 WL 5518215, at *3 (quoting *Butera*, 235 F.3d at 657). For example, without more, showings of fraud are not even enough to satisfy the requirements to institute punitive damages. *See id.* (citing *BWX Elecs. v. Control Data Corp.*, 929 F.2d 707, 712 (D.C. Cir. 1991)). Plaintiffs did not present evidence to fulfill this stringent standard.

The Court accepts that Defendant unlawfully converted Plaintiffs' car and remained unresponsive—and generally hostile—to inquiries to get the car back. *See* Compl. at 2–4. And so the Court does not altogether preclude the possibility that punitive damages could be possible in this action.[7] But Plaintiffs have a high bar to clear, and they have not attempted to make an argument for why punitive damages are appropriate here. Thus, the Court will not grant punitive damages based on the instant motion.

---

[7] For example, in 1969, the D.C. Court of Appeals upheld the imposition of punitive damages in an action for conversion where the plaintiff's car was converted. *Franklin Inv. Co., Inc. v. Homburg*, 252 A.2d 95, 98–99 (D.C. 1969). In that case, there was record evidence that the defendant knew plaintiff possessed title to the car but still went ahead and sold the plaintiff's car without notifying him. *See id.* at 98. The defendant "then proceeded to obtain a new title for the vehicle on the basis of deliberate and materially false representations made to the Maryland Department of Motor Vehicles." *Id.* Of course, here, there is no comparable factual record: it is not even known what ultimately happened to the 2015 RAV4.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' renewed motion for default judgment, ECF No. 14.  It is hereby **ORDERED** that on or before April 22, 2024, Plaintiffs should file "an additional submission to substantiate [their] damages claim."  *SNH Med. Off. Props. Tr.*, 325 F.R.D. at 521.  The Court again advises that this submission should include supporting declarations and documentary evidence.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 21, 2024                                                           RUDOLPH CONTRERAS
                                                                                            United States District Judge